PEYSER *et al. v.* MYERS *et al.*

*(Supreme Court, General Term, First Department.   March 31, 1892.)*

1. PARTNERSHIP—PROOF OF MEMBERSHIP.
    Defendants' testator agreed to receive 12 per cent. on his capital invested in a partnership in lieu of profits.   On dissolution of the firm by limitation, a new firm was formed under the same name, and the testator loaned the capital to it at 12 per cent. interest.   The new members of the firm testified to testator's retirement, but were unable to fix the date; but one of the old members testified positively to the retirement before the formation of the new firm, and it appeared that notice of the retirement was published by assent of the parties.   The firm at the time was prosperous and solvent.   Thereafter an account was opened with such retiring member as a private account, and for five years thereafter various small sums realized from the liquidation of the old firms of which he had been a member were placed to his credit.   Letters between the parties clearly showed that a loan was intended, and the entries in the books of the new firm for 11 years prior to its assignment showed the change in testator's account.   The account of another retiring member was kept in the borrowed and lent book, while testator's was kept in the private ledger; but it appeared that the amount of the former's credit was but a few dollars, and that small accounts were kept in such book.   The books also showed private accounts for the continuing partners, but they had also stock accounts, which testator had not, although he had had before his retirement.   *Held*, that the evidence sufficiently showed that defendants' testator was a creditor of the new firm, and not a member thereof.

2. SAME—NOTICE OF RETIREMENT.
    The publication of a notice of retirement of a member thereof from a firm is admissible in evidence to prove actual retirement therefrom.

3. SAME—STATEMENTS OF MEMBERS.
    For the purpose of determining whether a member of a partnership retired therefrom at a certain time, or became a member of a new firm, the dealings of the members of the new firm with one another and the public, their statements to each other and the public, whether written or oral, and their books, are all competent evidence.

4. SAME—AGREEMENT TO RETIRE.
    It is unnecessary that the retirement of one member of a firm should be formally agreed to by the others when the partnership has expired by limitation.

5. SAME—LIABILITIES OF NEW PARTNER.
    An employe of a firm was admitted to membership without inquiry on his part as to assets or liabilities.   No new capital was contributed, except that the stock in trade, book accounts, etc., of the old firm were turned over to it, and the firm continued to do business without notice of any kind of the admission of such new member.   There was no arrest or settlement of the old firm's accounts, and an indebtedness of the old firm for moneys loaned was transferred to the books of the new firm.   The new member knew of the indebtedness, but took no steps to ascertain the amount or the agreement upon which it arose.   Between the time of his admission and a general assignment thereafter made by the firm, statements of the accounts as they appeared on the firm books were set to the executors of such creditor, with charges for merchandise sold.   Such member united in a general assignment made by the firm, preferring such claim, and made no defense to an action against the firm for its recovery.   *Held*, that the assumption of the indebtedness was a part of the agreement by which such new member was admitted to the firm, and that it became an indebtedness of the new firm.   *Mores v. Society*, 19 Wkly. Dig. 247, followed.

6. SAME.
    In such a case, a finding that neither the new partner nor the new firm entered into any agreement with the defendants, by which he or they assumed any liability in favor of the defendants and against any prior firm, is merely a finding that there was no formal agreement to assume such indebtedness, when to construe it as meaning there was no implied agreement would make it inconsistent with other findings and with the decision of the trial court.

7. ASSIGNMENT FOR BENEFIT OF CREDITORS—PREFERENCE—COMPOUND INTEREST.
    The payment and receipt in good faith of a claim preferred by a general assignment, which includes compound interest, computed without knowledge of its illegality, will not render such payment and receipt fraudulent as to creditors, but such payment is good as to that portion which is exclusive of the compound interest.

Appeal from special term, New York county.

Action by Henry M. Peyser and others against Matthew R. Myers and others, executors of John K. Myers, deceased, to set aside an assignment made

by Halstead, Haines & Co. as fraudulent, and that judgments obtained by plaintiffs should be paid out of a preference in such assignment to defendants. From a judgment dismissing the complaint as against defendants, plaintiffs appeal.   Affirmed.

The forty-third finding of the trial court was as follows: "That neither the defendant J. Edward Bentley, nor the firm of Halstead, Haines & Co., which executed the said general assignment, entered into any agreement with the defendants, the executors of John K. Myers, deceased, by which he or they assumed any liability in favor of the said defendants and against any prior firm known as Halstead, Haines & Co."

For former reports, see 5 N. Y. Supp. 827; 9 N. Y. Supp. 229.

Argued before VAN BRUNT, P. J., and BARRETT and ANDREWS, JJ.

*John J. Adams* and *Chas. E. Hughes,* for appellants.

The preference, being fictitious in part, must wholly fail. *Simons* v. *Goldbach,* (Sup.) 9 N. Y. Supp. 359; *Russell* v. *Winne,* 37 N. Y. 591; *Johnson* v. *Philips,* (Sup.) 2 N. Y. Supp. 432; *Talcott* v. *Hess,* 31 Hun, 284, citing *Fiedler* v. *Day,* 2 Sandf. 594, and *Bank* v. *Webb,* 36 Barb. 291.

*Stimson & Williams,* ( *Wm. Pierrepont Williams,* of counsel,) for respondents.

ANDREWS, J.   The firm of Halstead, Haines & Co. made a general assignment for the benefit of creditors on July 12, 1884, and in that assignment the defendants, as executors of John K. Myers, deceased, were given a preference of $102,872.   On August 9th of the same year said defendants recovered a judgment against the assignors for the full amount of such preference, and in October, 1884, said sum of $102,872 was paid to the defendants by the assignee.   The present action was commenced in the summer of 1888, and the relief sought was that such assignment should be set aside, upon the ground that it was made with intent to hinder, delay, and defraud creditors, and that the judgments obtained by the plaintiffs against said assignors should be paid out of said $102,872.   The present action has been tried twice.   Upon the first trial it was decided that the assignment was void, but the complaint was dismissed as to the defendant executors.   Upon appeal to the general term, the decision of the special term as to the invalidity of the assignment was sustained, but it was held that said preference of $102,872 included compound interest, and upon that ground only the judgment was reversed, and a new trial ordered.   9 N. Y. Supp. 229.   Upon the second trial it was conceded that the assignment was void, and the court found that the amount of such compound interest was $20,223.   The action was tried at the same time with another action, brought by Milliken and others against the same defendants, but which had been commenced before this action was brought.   The plaintiffs in the Milliken action, having a priority, were adjudged to be entitled to receive such sum of $20,223, and judgment was entered in this action dismissing the complaint as against the defendant executors, and from that judgment this appeal is taken; and it is now contended that the claim of the defendant executors, which was satisfied by the said sum of $102,872, was not a just and valid one as against *bona fide* creditors for the following reasons: *First,* because, if it existed at all, it was due by an insolvent firm to one of its members, or his estate, and should therefore be postponed to the claims of outside creditors; *second,* because it was not due by the firm which assigned; *third,* because it was for the most part fictitious.

The validity of the reason first above mentioned depends upon the determination of the question whether John K. Myers, Sr., deceased, retired from the firm of Halstead, Haines & Co. on December 31, 1872, or whether he continued to be a member of that firm until the time of his death, in the year 1877.   The contention of the plaintiffs is that said Myers, Sr., continued to be a member of said firm until the time of his death; but this question has

been decided adversely to the plaintiffs, twice by the special term and once by the general term of this court,—*Peyser* v. *Myers*, (Sup.) 9 N. Y. Supp. 229; and, after a very careful consideration of the able and elaborate brief submitted by plaintiffs' counsel, we have reached the conclusion that such decisions were correct, and that the evidence in the case conclusively proves that said Myers, Sr., retired from said firm on the 31st of December, 1872. Halstead, Haines & Co. was the firm style adopted by several firms which succeeded each other during the period from before 1860 down to 1884, when the firm last succeeding to the name executed the assignment in question, with the intent, as the defendants admit, to hinder, delay, and defraud creditors. Among the creditors preferred in the assignment were the defendants, who are the executors of John K. Myers, Sr., who died in September, 1877. Said Myers, Sr., was in his lifetime a member of the several successive firms which were distinguished from one another by letters of the alphabet. At the commencement of firm "I," said Myers, Sr., having accepted the presidency of an insurance company, and wishing to give less time to the affairs of said firm, agreed to remain a partner during the continuance of said firm "I," during the years 1870, 1871, and 1872, and to receive in lieu of profits a fixed interest of 12 per cent. on his capital. Said firm "I" was dissolved, by limitation of time, on December 31, 1872, and the contention of plaintiffs is that said Myers continued to be a member of firm "K," which commenced on January 1, 1873, up to the time of his death in 1877; whereas the contention of the defendants is that on December 31, 1872, when firm "I" was dissolved, said Myers had an adjustment with his partners as to the amount of his capital, and did not become a member of the new firm "K," but made a loan of the whole amount of his capital, as so adjusted, to said firm "K" at 12 per cent. interest.

Several witnesses who were called on behalf of the defendants upon the last trial testified that said Myers, Sr., retired from said firm on December 31, 1872. William A. Haines, Jr., testified that he went into the firm in January, 1870, and that Mr. Myers retired two or three years afterwards. He admitted that upon the first trial he had stated that he did not know when Mr. Myers retired, but explained that he supposed he was being asked about an exact date. He also said that he had always known that Myers, Sr., retired from the firm within two or three years from the time he went in,—in 1870. John K. Myers, Jr., testified that he knew on the date of retirement that his father had retired. On the first trial he testified that his father retired in the latter part of 1872, though he could not fix the exact date. The testimony given by these witnesses is criticised by plaintiffs' counsel because of its alleged want of precision as to the date of retirement, and because of the alleged contradiction between the testimony given on the first and second trials. It appears, however, that at the time of retirement of Myers, Sr., his son, Myers, Jr., and Haines, Jr., were very young men, who had put no capital into the firm, had no voice in its management, whose share of the profits was trifling, who acquiesced in whatever was done by their seniors, and who were admitted to the partnership merely because of their being sons of such senior members of the firm. Under these circumstances, after the lapse of 20 years, it is not surprising that their recollections are not more precise and definite as to the time of the retirement of Myers, Sr. The alleged contradictions between the testimony given by them, respectively, on the first and second trials of the action, are not of a serious character, and their testimony, taken as a whole, certainly tends strongly to establish the fact that Myers, Sr., never became a member of the firm "K." William M. Halstead, another member of the firm, was also examined as a witness, and he testified positively and unequivocally that Myers, Sr., retired on December 31, 1872. His testimony is also criticised by plaintiffs' counsel, upon the ground, among others, that on the first trial Mr. Halstead stated that inter-

est was paid Myers, Sr., until 1877, under the agreement or arrangement made in 1870; but we think it is clear from all the testimony given by this witness that such statement related to the amount of interest only which was paid, and not to the legal relations under which said payment was made. Plaintiffs' counsel also criticises the testimony given by Mr. Halstead, to the effect that the amount of Myers, Sr.'s, interest in the firm was not definitely settled up until 1877. It does not seem to us, however, that such criticism is warranted, because it appears that after the adjustment, made at the time of the retirement of Myers, Sr., his credit was increased by the transfer to his account of small amounts of profits realized on the liquidation of old firms that had gone out of active business many years before. John Wilson, who was assistant bookkeeper of Halstead, Haines & Co. prior to January 1, 1873, and then became head bookkeeper, testified that some time after the formation of firm "K," in pursuance of instructions of one or more members of the firm, he opened for Myers, Sr., a private account, as distinguished from the stock account.

The oral testimony given by the above witnesses to the effect that Myers, Sr., never became a member of firm "K," is confirmed by documentary evidence. On January 1, 1873, the following notice was published in the New York Times: "Mr. John K. Myers retires from our firm this date, December 31st, 1872. HALSTEAD, HAINES & Co." Counsel for plaintiffs contend that this notice was not admissible as evidence; that it was published without authority of the firm; that the publication was obscurely made, and was for the sole purpose of shielding Myers, Sr., from future liabilities, and therefore was not published in good faith. We are of opinion that the notice was properly admitted in evidence. The objection that it was *res inter alios acta*, and not competent against the plaintiffs, would apply with equal force to much of the other evidence in the case, including that on which the plaintiffs rely to prove that Myers, Sr., became a member of firm "K." For the purpose of determining whether Myers, Sr., retired in December 31, 1872, the dealings of the members of the old firm with one another and with the public, their statements to each other and to the public, whether written or oral, and their books, were all competent evidence; and we think that no error was committed in the admission of such notice as evidence upon the trial. The objection that the notice was not published by authority of the firm is unfounded, for while Mr. Halstead, after a lapse of 20 years, was unable to remember what member of the firm sent the notice to the newspaper for publication, he testified positively that the partners assented to it. The suggestion that the publication was obscure is equally unfounded. Such publication was made in one of the leading dailies, and it is inconceivable that the firm should have supposed that an announcement, made in this manner, should not attract the attention of the reading public. The suggestion that the notice was given in order to shield Myers, Sr., from possible future liability does not call for serious consideration. At the time of such publication the firm of Halstead, Haines & Co. was solvent, having a net surplus of several hundred thousand dollars over and above the amount belonging to Myers, Sr., and the assignment of the firm was not made until 12 years afterwards. Certain letters written by Haines, Sr., to Myers, Sr., in 1877, also tend to show that the latter had ceased to be a member of the firm. It would seem that Myers, Sr., was apprehensive that the defense of usury might be set up against him, and such apprehension led to correspondence between him and Haines, Sr. In one of these letters Haines wrote on behalf of his firm, as follows: "The money you have had with us at a higher rate was not an ordinary loan, but more as permanent capital for years, subject only to notice in writing, etc. * * * In making the change you propose, it would be virtually changing it to a call loan." This letter clearly shows that Haines, Sr., considered that the money which Myers, Sr., had left with

firm "K" was not capital, but a permanent loan. It is hardly to be supposed that such a letter was written in anticipation of an assignment which was made seven years later. The entries in the books of the firm, which were read in evidence, also furnished convincing evidence that Myers, Sr., never became a member of firm "K." Prior to January 1, 1873, the accounts of all the partners, including Myers, Sr., were kept on adjoining pages, and headed with the word "Stock;" but after January 1, 1873, the accounts of the continuing partners were still kept on adjoining pages of the ledger, and still headed "Stock," but on that date the account of Mr. Myers was transferred to a page some 70 pages distant from the stock accounts of the partners, and was headed, "Private Account." Moreover, after January 1, 1873, the conceded partners had a stock account and a private account, but after that date there never was any account with Myers, Sr., headed "Stock Account."

It also appeared that when firm "G" succeeded firm "F," a part only of Myers' credits, as shown on the books of firm "F," was carried forward to his credit on the books of firm "G," the balance being left in firm "F" for liquidation; that the same course was taken when firm "H" succeeded firm "G," and when firm "I" succeeded firm "H;" and that this same plan was adopted in the case of all the other continuing partners. When firm "K," however, succeeded firm "I,"—on January 1, 1873,—this plan was still followed as to the other partners, but was then for the first time abandoned as to Mr. Myers, Sr. . These changes in the manner of keeping the books of the firm, which were made 11 years before the assignment, would certainly indicate that on January 1, 1873, the relations of Myers, Sr., to firm "K," which was formed January 1, 1873, were very different from what they had been to the firm "I," of which he had been a partner, receiving since 1870, in lieu of profits, 12 per cent. upon his capital. It is inconceivable that such changes in the manner of keeping the books should have been made if Myers, Sr., became a member of firm "K." The learned counsel for the plaintiffs, however, strenuously contends that entries made in the books of the firm after January 1, 1873, show that Myers, Sr., still continued to be a member of the firm. We have examined the evidence and the brief of counsel with great care, and after such examination it appears to us that every point raised by him is fully met in the brief of the counsel of the defendant executors, and that his contention is not well founded. One of his contentions is that the word "stock," as used in the first line of Exhibit D, characterizes the whole page as a stock account. We agree, however, with counsel for the defendants that said word "stock" was used merely to designate the book—stock ledger—from which the $141,056.87 was posted, and that this appears to be the true explanation from the general system of making entries, as illustrated on the same page, from the fact that the word "stock" is immediately followed by the legend "Fo. 1," which indicates that page 1 of some book is referred to; from the fact that it is conceded that the word "stock," as used in another place, was an abbreviation of "stock ledger;" and from the fact that the fly leaf of the stock ledger, which is actually page 1, contains the sum which is mentioned in the disputed entry, and opposite to that sum the words "Ledger, page 76," which show a transfer to the book and page where the disputed entry appears. The plaintiffs' counsel also attaches importance to certain entries in the special cash book of firm "K," showing that various sums were posted from that book into Mr. Myers' account. Opposite these entries were sometimes the word "stock," and sometimes the letters "B" and "L," but it appears by the testimony of the expert called by the plaintiffs that the word "stock," as thus used, did not indicate the character of the account, but merely showed that the entry to which it was opposite was posted in the stock ledger, instead of the "borrowed and lent" ledger. Counsel for plaintiffs also calls attention to the fact that after December 31, 1872, the account of C.

F. Thomas, who retired from the firm on that day, was subsequently kept in the "borrowed and lent" ledger, whereas Mr. Myers' account was kept in the private ledger. This circumstance, however, is explained by the fact that Mr. Myers' credit on the dissolution of firm "I" was $151,828, and that Mr. Thomas' credit was only $6.85, and that the smallness of Mr. Thomas' credit furnishes a reason for carrying his account among the smaller accounts, which were kept in the borrowed and lent book; and this explanation appears to us to be a satisfactory one.

Counsel for the plaintiffs also lays great stress upon the accounts on page 76 of ledger "K." The entries as they appear on that page are as follows:

1874.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jan. 1. | By balance | - | - | - | - | - | - | $140,000 |
| July 1. | " int. | Spc. K. 174 | - | - | - | - | | 4,900 |
| " | " " | Spec. " | - | - | - | - | | 3,500 |
| Dec. 31. | " " | Spec. " | - | - | - | - | | 3,500 |
| " | " " | Spec. | - | - | - | - | | 4,900 |

The contention of plaintiffs' counsel is that the letters "Spc. K." were originally "stock," and were afterwards changed. We think that this contention of plaintiffs' counsel is wholly unfounded, and for the reasons assigned in the brief of the defendants' counsel, namely, the word "stock," in the place where the letters "Spc. K." would have been unintelligible; and if the word had been "stock," the figures 174 would have been meaningless. The bookkeeper who made the entries testified that he never wrote the word "stock" there, but what he did write was "Spc. K.," referring to cash book "K," and that the word "Spc." was the contraction for "special," and that "K" was the title of the cash book, and that what he first wrote had never been changed; that under the disputed word, and with reference to the same page, 174, occurred three times "Spc.," which the bookkeeper testified was a contraction for "special;" also that special cash book "K" was produced and put in evidence, and that on page 174 thereof, as of the same date, appeared the amount $4,900, with an entry which showed a posting of that amount on that date on page 76 of the stock ledger. The entries on page 174 of special cash book "K" are as follows:

Stock.

| | | | |
|---|---|---|---|
| July 1–76. | John K. Myers, by int. 6 mos. on $140,000 at 7% per an., - - - - - - | - | $4,900 |
| 1–" | John K. Myers, by Exp. 6 mos. on 140,000 at 5% per an., - - - - - | - | 3,500 |
| Dec. 31–" | John K. Myers, by Exp. 6 mos. on 140,000 at 5% per an., - - - - - | - | 3,500 |
| " | John K. Myers, by int. 6 mos. on 140,000 at 7% per an., - - - - - | - | 4,900 |

Plaintiffs' counsel calls attention to various other facts, which he claims tend to show that Myers, Sr., became a member of firm "K," but we do not think that such facts warrant the inferences sought to be drawn from them. It is said that after January 1, 1872, the ledgers show private accounts for the continuing partners, as well as for Mr. Myers. This fact, however, has not the significance which counsel claims for it, because it also appears that, while the continuing partners had stock accounts, Mr. Myers had no account of that description. It is also suggested that from 1870 to January 1, 1873, Mr. Myers, though stated to have been a member of the firm, was not included among those who divided the profits. The answer to this suggestion is that during said period Mr. Myers was not entitled to profits, as such, because he had expressly agreed to take 12 per cent. interest on his capital in lieu of profits. It is also suggested that a stock account would have been unnecessary for Mr. Myers, even had he remained a partner, for the reason that there was no share in the profits or losses credited or charged to him.

If, however, Mr. Myers had been a partner, his account would necessarily have been a stock account, whether the return on his capital was a share of the profits or a fixed percentage on its amount. It would have been the fact of his having capital, and not the nature of the return upon it, that would have made a stock account appropriate. It is conceded that Mr. Myers had a stock account on the books during the years 1870, 1871, and 1872, although during those years he received a percentage on his capital in lieu of profits. A change from a stock account to a private account was made when the percentage which he received began to represent interest on the loan, instead of a return for capital. No significance can be attached to the fact that the balance of Mr. Thomas, the partner, who also retired at the end of 1872, was not transferred to the new firm "K," for the reason that Thomas had made no arrangement to leave the amount due him by firm "I" as a loan to firm "K," nor had he any other connections with said firm "K." It is also claimed that the fact that Myers' account as to the principal sum was kept in the ledger, instead of the "borrowed and lent" book, tends to show that he continued to be a member of the firm after January 1, 1873. The account, however, was in terms a private account, and not a stock account; and besides, this fact, if it justified the inference sought to be drawn from it, would prove too much, as all the succeeding firms, down to the assignment in 1884, followed the same plan in keeping the main account in the ledger, and the auxiliary account in the borrowed and lent book. The argument, therefore, if sound, would tend to prove that Mr. Myers continued a partner for nearly seven years after his death. It is also suggested that several years after 1872 Mr. Myers received 12 per cent. on his money, which was the same amount that he received during the years 1870, 1871, and 1872, when it is conceded he was a partner. The explanation of this fact may be found in the correspondence which passed between Mr. Myers and Mr. Haines in 1877. It appears from that correspondence that Mr. Myers could not have required payment of his loan except after six months' notice, and then only in moderate "monthly installments." His loan was unsecured, and this arrangement rendered it more precarious than it otherwise would have been, and justified him in demanding a large return. The contention of plaintiffs' counsel that it was necessary for W. A. Haines, Jr., and John K. Myers, Jr., to formally agree that Mr. Myers should retire, is not well founded. The firm "I," of which they were all members, expired by limitation; and Myers, Sr., could not have become a member of firm "K" except by an agreement on his part so to do. Moreover, upon the testimony, there can be no doubt that these young men knew that Mr. Myers had retired from the business, and acquiesced in such retirement. The suggestion that Mr. Myers, after his retirement, was credited with profits, is answered by the fact that such profits were those realized not by firm "K," but from old firms, whose affairs were in liquidation.

The second ground upon which plaintiffs' counsel contends that the claim of the defendant executors was not a just and valid one as against creditors is that it was not due by the firm which assigned; but we do not think this contention is well founded. Bentley had been an employe of the firm for many years, and in 1880 was given an interest in the profits as salary; and on February 1, 1882, was taken in as a partner, without any inquiries on his part as to the assets and liabilities of the firm. No one contributed any capital to the new firm, except that the stock in trade, book accounts, etc., of the old firm were turned over to it. The new firm went right on with the business of the old firm, at the same place, with the same stock, the same customers, and without giving notice, by publication or otherwise, of Bentley's admission as a partner. There was no arrest or settlement of the old firm's accounts, but the business of the old firm was continued by the new firm without any break; the new firm collecting the old firm accounts, and selling the old stock in trade, and collecting the moneys for that. The Myers

account was transferred to the books of the new firm, and Bentley never looked at the books to inform himself as to the details of it. During the period that elapsed between Bentley's admission to the firm and the assignment the firm sent to the executors of the Myers estate statements of account, showing the indebtedness to said estate, as it appeared in the books of the firm, and containing charges against Mrs. Myers for merchandise sold her during the years 1882, 1883, and 1884, which charges were deducted from the amount that would otherwise have been due. Bentley himself was called as a witness, and testified that it was his intention to take the affairs of the old firm as he found them, and go on with them as a member of the new firm; that, before he went into the firm, he asked for no statement of its assets or liabilities; that he was in for a three-years partnership, and did not propose to make any inquiries for those three years; that he had nothing to do with the financial operations of the firm, or with the books; that, knowing the firm to be using money of Myers, he never took the trouble to inquire how much or under what agreement; also that he never knew of any difference being made in the firm's dealings because of his going into it. Moreover, Bentley voluntarily united with his partners in preferring the Myers claim, and made no defense to the action brought against the firm for the recovery of it. We are of the opinion that, under these circumstances, it must be considered that the assumption of the existing indebtedness of the old firm to the Myers estate was a part of the agreement whereby Bentley became a partner in the firm, and that such indebtedness became an indebtedness of the firm of which Bentley was a member. The case falls within the rule laid down by the general term of this department in the case of *Mores* v. *Society*, MS. Op., DANIELS, J., (less fully in 19 Wkly. Dig. 247.) In that case it appeared that Henry Louis, who had been carrying on business alone, took his brother into partnership, and the new firm, Henry Louis & Co., continued the business with the same stock, the same customers, and without arrest of accounts. To a claim in favor of the firm the defendant was allowed to set off sums paid to Henry Louis before the partnership was formed. Mr. Justice DANIELS, in the course of his opinion, said: "It has been further urged that the referee erred in extinguishing the balance which accrued while the partnership continued by applying upon it payments which had, previous to the partnership, been made to Henry Louis, one of its members. But this partnership was not formed for the mere purpose of commencing and carrying on the business which was transacted. That had before been created and exclusively carried on by Henry Louis himself, and the only change which was made in the business was by his brother, the other assignor, buying into it, and going on with it as he found it to exist. There was no arrest or settlement of the preceding accounts, but the business was carried right along; the only change in it being that by the partnership another person became interested in it. What was in process of transaction in the course of the business of Henry Louis was from that time taken up and carried on by Henry Louis and his brother. They proceeded apparently with the same stock, the same accounts, and the same customers; and they continued to deal with these customers as though the partnership itself had originated their business relations. The brother, who bought into the business, became entitled to his interest as a partner in the debts owing to it, and equally so liable to contribute, in the progress of the business, to the payment of the indebtedness owing to its customers by it. His relations and obligations were entirely different from what they would have been if the old business had been closed and a new business had been commenced from the time the partnership was formed. It was not necessary to subject the future dealings of the firm to the collection of the accounts which had accrued at the time of its formation that the indebtedness should have been specifically or in terms assumed by the incoming party. The fact that he bought into an existing

and continuing business would naturally subject the business to that obligation, and such appears to have been the understanding between these persons at the time when their business relations were formed."

It is claimed by plaintiffs' counsel that finding 43 negatives the idea that the firm of Halstead, Haines & Co., which made the assignment, assumed the existing indebtedness of the old firm to the Myers estate. We think, however, that a fair construction of this finding is that there was no formal agreement to assume such indebtedness, which, it is conceded, was never made. To construe the finding as meaning that there was no implied agreement would make it inconsistent with findings 56, 73, and 74, and with the decision of the trial court. Moreover, the finding, however construed, refers only to an agreement between Myers and the members of the firm of Halstead, Haines & Co. It does not purport to extend to the agreement between the continuing partners and Bentley, which was found by the special term, and was established by the testimony. Such an agreement, between Bentley and his partners, inured to the benefit of the respondents, even though there was no direct consideration issuing from them, and though they may not have been privy to it.

The third ground upon which it is claimed the judgment should be reversed is that the compound interest included in the preference greatly exceeded the sum of $20,223; but we do not think this contention is well founded. The method of computing the interest which yields the sum of $20,223 as the amount of compound interest included in the preference is the one which was held proper in the case of *State of Connecticut* v. *Jackson*, 1 Johns. Ch. 13, and is as follows: "The rule for casting interest, when partial payments have been made, is to apply the payment, in the first place, to the discharge of the interest then due. If the payment exceeds the interest, the surplus goes towards discharging the principal, and the subsequent interest is to be computed on the balance of principal remaining due. If the payment be less than the interest, the surplus of interest must not be taken to augment the principal; but the interest continues on the former principal, and until the period when the payments, taken together, exceed the interest due; and then the surplus is to be applied towards discharging the principal, and interest is to be computed on the balance as aforesaid." This rule was expressly approved by the court of appeals in *Young* v. *Hill*, 67 N. Y. 167. It was also adopted and approved in the following cases: *French* v. *Kennedy*, 7 Barb. 452; note to *Williams* v. *Houghtaling*, 3 Cow. 86; *Bennett* v. *Cook*, 2 Hun, 527, 529; *Smith* v. *Fox*, 2 City Ct. R. 339. The authorities cited are binding upon us, and we are also of the opinion that the contention of plaintiffs' counsel that interest should be calculated upon withdrawals is fully answered by the defendants' counsel as follows: "The objection made to the method thus established, that it does not allow for interest on withdrawals, is merely specious, and is met by the fact that, as soon as the withdrawals equal or exceed the accrued simple interest, a rest is made, and interest ceases upon so much of the principal as is paid. Until that happens, the debtor is in default on the interest that he owes, and therefore should not be allowed interest on the sums that he pays." We must therefore hold that the amount of compound interest included in the preference is only $20,223.

We are also of opinion that the respondents are entitled to retain all the preference money, except so much of it as represented compound interest. This was, in effect, the decision of the general term on the first appeal of this case, and we think such decision was correct. The method in which the interest was originally computed was erroneous, but such method was the one customary with commercial houses; and the compound interest was included in the preference and paid to respondents without any intent that they should receive more than was legally due, and without knowledge that the method

in which the interest was computed was illegal.    The excess of payment must therefore be regarded as having been made and received in entire good faith The cases cited by plaintiffs' counsel are those in which the fraudulent intent was actual, as distinguished from constructive.    Besides, in each of those cases there was involved the effect of some one entire instrument, which, under the statute against fraudulent conveyances, was absolutely void.    In the case at bar the respondents received $82,649 in payment of a valid debt, and the fact that there was paid and received by them in good faith, without fraudulent intent, an additional sum of $20,223 did not render the payment and receipt of $82,649 fraudulent.    We are also of opinion that it was proper to allow interest upon said sum of $20,223 only from the commencement of the present action.    The judgment should be affirmed, with costs.

VAN BRUNT, P. J.    I concur, but I do not assent to the proposition that entries in the books of firm "K" could in any way be resorted to as evidence that Myers was a member of that firm.    Myers was only bound by those entries if he was a member of the firm.    Hence it seems to me to be apparent that they cannot be resorted to to show that Myers was a member of the firm.

BARRETT, J., concurs.